**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LUZ AIDA CUEVAS, INDIVIDUALLY | : | CIVIL ACTION |
| ON HER OWN BEHALF AND AS | : | |
| PARENT AND NATURAL GUARDIAN | : | |
| OF, AND ON BEHALF OF DELIMAR | : | |
| VERA, A MINOR, ET AL., | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL., | : | |
| Defendants. | : | No. 05-3749 [Consolidated] |

Gene E.K. Pratter, J.          Memorandum and Order          August 11, 2006

The Defendants in these consolidated[1] civil rights cases brought pursuant to 42 U.S.C. §
1983 move to dismiss the complaints filed pursuant to Federal Rule of Civil Procedure 12(b)(6).
After much analysis and with considerable appreciation for the professional skills of several of
the counsel involved in this wrenching case that has, no doubt, caused many heads to shake in
wonder at its occurrence and many sympathetic helping hands to be extended to the people
involved, for the reasons discussed below, the motions to dismiss the complaints will be granted.

FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are Luz Aida Cuevas, Pedro Vera and Delimar Vera.[2]  The defendants are
the City of Philadelphia, Harold B. Hairston, John J. Grugan, Vincent W. Heeney, Robert J.
McBrearty, Lucien Cerulli, Joseph E. Rissling, Haresh Mirchandani, M.D., Carl Spurill, David

---

[1]  Ms. Cuevas filed the initial complaint in this case on July 20, 2005.  Mr. Vera followed
with his complaint on September 21, 2005.  The two cases were subsequently consolidated.

[2]  Ms. Cuevas and Mr. Vera are the biological parents of Delimar, and each of them, in
addition to asserting their own putative individual claim, also assert a claim on behalf of and as
parent and natural guardian of Delimar.

Quain, Greg McDonald, D.O., Carolyn H. Revercomb, M.D., and Richard Neal (the "City Defendants").[3] Dr. Pat Kauffman, who is not employed by the City of Philadelphia, is also a defendant.

The claims arise from a fire that occurred on December 15, 1997, which allegedly began in the second floor front bedroom of the Cuevas home, where Ms. Cuevas's infant daughter, Delimar, slept.  Cuevas Compl. at ¶¶ 21-22; Vera Compl. at ¶ 21.  Plaintiffs allege that upon realizing that there was a fire in her home, Ms. Cuevas immediately ran to Delimar's room, but that the baby was not in her crib.   Cuevas Compl. at ¶ 22; Vera Compl. at ¶ 22.  Ms. Cuevas then allegedly left the room and soon thereafter attempted to re-enter it but could not do so because of smoke and flames.  Cuevas Compl. at ¶ 22. According to Ms. Cuevas, the Philadelphia Fire Department responded to the fire and had it under control within just 14 minutes.  Cuevas Compl. at ¶ 23; Vera Compl. at ¶ 23.  Ms. Cuevas asserts that as the Fire Department and other City officials were responding, she reported to a representative of the Fire Department and/or Fire Marshal's Office that her infant daughter was missing, and reported that she had personally entered the front bedroom during the fire, but saw clearly that her daughter was not there.

---

[3]  Mr. Hairston was the Philadelphia Fire Commissioner, Mr. Grugan was the Deputy Chief and Fire Marshal for the City of Philadelphia, Mr. Heeney was a Lieutenant with the Philadelphia Fire Marshal's Officer, Mr. McBrearty was a Battalion Chief with the Philadelphia Fire Department, Mr. Cerulli was an Assistant Battalion Chief with the Philadelphia Fire Department, and Mr. Rissling was a Lieutenant with the Philadelphia Fire Department.  Dr. Mirchandani was the Medical Examiner for the City of Philadelphia, Mr. Spurill was an Investigator with the Office of the Medical Examiner, Mr. Quain was the Chief Investigator with the Office of the Medical Examiner, Dr. Kauffman was a Forensic Fellow with the Office of the Medical Examiner, Dr. McDonald was an Assistant Medical Examiner with the Officer of the Medical Examiner, and Dr. Revercomb was an Assistant Medical Examiner with the Officer of the Medical Examiner.  Richard Neal was the Commissioner of the Philadelphia Police Department.

Cuevas Compl. at ¶ 24; Vera Compl. at ¶ 24.  Mr. Vera asserts that upon learning of the fire, he

immediately went to the home, only to be told that his infant daughter had perished in the fire.

Vera Compl. at ¶¶ 25-26.

Approximately six years after the fire, on January 24, 2004, Ms. Cuevas alleges that she

was attending a children's party and spotted a six-year old girl who "bore a striking resemblance

to herself." Cuevas Compl. at ¶ 37; Vera Compl. at ¶ 35.  Ms. Cuevas obtained a lock of the

girl's hair, arranged to have a DNA analysis conducted and eventually learned that the young girl

was, in fact, her missing daughter, who had been kidnaped from the home and raised by another

woman, Carolyn Correa.  Cuevas Compl. at ¶¶ 37-38; Vera Compl. at ¶¶ 35-37.  Ms. Cuevas

alleges that during the time that Delimar lived with Ms. Correa, Delimar was subjected to

physical and psychological abuse.  Cuevas Compl. at ¶ 40.  Ms. Correa was subsequently arrested

and charged with kidnapping, arson and other related criminal offenses.  Vera Compl. at ¶ 40.

Delimar presently resides with Ms. Cuevas.

A.      **Cuevas Complaint**

Ms. Cuevas filed her complaint on July 20, 2005.  The basis of the two-count complaint

is that all of the defendants violated Ms. Cuevas and Delimar's federal statutory right under the

National Child Search Assistance Act of 1990[4] and/or their right to procedural due process under

the Fourteenth Amendment by failing to conduct a proper search for Delimar at the time of and

---

[4]  42 U.S.C. §§ 5779, 5780.  While Ms. Cuevas refers to the statute as the Missing
Children's Act, and Defendants refer to it as the Missing Children's Assistance Act, the proper
name for the statute in question is the National Child Search Assistance Act of 1990.  The matter
is a bit more complicated by the fact that, as will be discussed below, the provisions under which
Ms. Cuevas asserts her claims were enacted as part of the Crime Control Act of 1990, and were
not part of the original statute, which was enacted in 1974.  In the interest of accuracy, the statute
will be referred to as the National Child Search Assistance Act.

shortly after the fire.  Cuevas Compl. at ¶ 43.  Ms. Cuevas specifically alleges that despite her efforts to persuade the officers that her daughter was missing, two of the Fire Department defendants – Mr. Heeney and Mr. McBrearty – conducted only a cursory search for Delimar and, after not being able to locate Delimar's body or her remains, declared that she had died in the fire, and that Mr. Heeney, Mr. Cerulli and Mr. Rissling each failed to report Delimar as a missing child as was required under the National Child Search Assistance Act.  Cuevas Compl. at ¶¶ 28-31.

Ms. Cuevas further alleges that the Office of the Medical Examiner also conducted an inadequate investigation into Delimar's disappearance, in that although no body or remains were ever located in the remnants from the fire, and no death certificate was ever issued, the Medical Examiner presumed that the newborn had "been completely consumed by the fire."  Cuevas Compl. at ¶ 32.  Ms. Cuevas additionally alleges that after being notified that no remains had been located, the Philadelphia Police Department did not conduct an investigation as to Delimar's whereabouts.  Cuevas Compl. at ¶ 34-36.

Ms. Cuevas asserts that these failures to comply with the National Child Search Assistance Act, both singularly and collectively, constituted a violation of her and Delimar's rights, both under the statute and pursuant to procedural due process.[5]  Ms. Cuevas finally alleges that the City of Philadelphia is at fault because at all material times, it was the City of Philadelphia's policy, custom and/or practice to not adequately train and/or instruct Fire

---

[5]  The Court notes that although the Cuevas Complaint does not set forth a separate count alleging a violation of procedural due process, both counts of that Complaint allege that the National Child Search Assistance Act establish a statutory and/or procedural due process right. Cuevas Compl. at ¶ 43.  Thus, the Court construes the procedural due process claim to be asserted via a property interest conferred by the statute.

Department, Fire Marshal's Office, Medical Examiner's Office and Police Department personnel regarding, among other things, their obligations under the National Child Search Assistance Act, how to properly identify a person as "missing," and how to properly investigate to determine whether a person is missing or dead, and that it was the custom and practice of the City not to follow the requirements set forth in the Act.  Cuevas Compl. at ¶¶ 26 - 27.

B.     **Vera Complaint**

Mr. Vera filed his six-count complaint on September 21, 2005.  Like Ms. Cuevas, in the first two counts of his complaint Mr. Vera alleges that all of the defendants violated his and Delimar's rights under the federal National Child Search Assistance Act and/or federal constitutional due process.[6]  However, Mr. Vera's complaint includes some additional claims.

---

[6]  Like Ms. Cuevas, Mr. Vera alleges that despite Ms. Cuevas's efforts to persuade the officers that her daughter was missing, two of the Fire Department defendants – Mr. Heeney and Mr. McBrearty – conducted only a cursory search for the baby and, after not being able to locate the baby's body or her remains, declared that the baby had died in the fire, and that Mr. Heeney, Mr. Cerulli and Mr. Rissling each failed to report Delimar as a missing child as was required under the National Child Search Assistance Act.  Vera Compl. at ¶¶ 27-30; 42-44.

Mr. Vera further alleges that the Office of the Medical Examiner conducted an inadequate investigation into Delimar's disappearance, in that although no body or remains were ever located, and no death certificate was ever issued, the Medical Examiner presumed that the baby had "been completely consumed by the fire."  Vera Compl. at ¶ 31-33.  Mr. Vera alleges that after being notified that no remains had been located, the Philadelphia Police Department did not conduct an investigation as to Delimar's whereabouts.  Vera Compl. at ¶ 34.  Mr. Vera asserts that these failures to comply with the National Child Search Assistance Act, both singularly and collectively, constituted a violation of his and Delimar's rights.  Vera Compl. at ¶¶ 51-53.

Mr. Vera finally alleges that the City of Philadelphia is at fault because at all material times, it was the City of Philadelphia's policy, custom and/or practice to not adequately train and/or instruct Fire Department, Fire Marshal's Office, Medical Examiner's Office and Police Department personnel regarding, among other things, their obligations under the National Child Search Assistance Act, how to properly identify a person as "missing," and how to properly investigate to determine whether a person is missing or dead, and that it was the custom and practice of the City not to follow the requirements set forth in the Act.  Vera Compl. at ¶¶ 45-47.

Specifically, in Counts 3 and 4 of the Complaint, Mr. Vera claims that the Individual Defendants

and the City, respectively, deprived Mr. Vera and Delimar of their rights to substantive due

process under the Fourteenth Amendment.[7]   In Counts 5 and 6 of his Complaint, Mr. Vera

alleges that the Individual Defendants and the City, respectively, are liable for state law tort

claims for intentional  infliction of emotional distress upon both him and Delimar.

### C.     Pending Motions

The City Defendants and Dr. Kauffman[8] (collectively, "the Defendants") move to dismiss

both complaints on several grounds.  The Defendants first argue that the National Child Search

Assistance Act does not confer a federally protected private right on Ms. Cuevas, Mr. Vera

and/or Delimar Vera.  Next, Defendants argue that even if such a right were found to exist, the

individual defendants named in the Complaint were not required reporters under the Act.  The

Defendants further argue that any claims against Messrs. Hairston, Neal and Mirchandani fail

because neither Ms. Cuevas nor Mr. Vera attributed any conduct to these defendants and that the

claim against Dr. Kauffman must be dismissed because Delimar was never reported as missing to

anyone at the Office of the Medical Examiner.  The City Defendants' final argument with respect

to the National Child Search Assistance Act is that the claims must be dismissed because none of

the Defendants qualify as a "law enforcement agency" within the meaning of the National Child

---

[7]  Although the Defendants argue that these counts of the Vera Complaint pertain only to
Mr. Vera, as will be discussed herein, a substantive due process claim on behalf of Delimar is
asserted with respect to the state-created danger theory.

[8]  Dr. Kauffman filed a separate Motion to Dismiss the Cuevas Complaint, in which she
incorporates by reference the memorandum of law submitted on behalf of all other Defendants,
and adds a few additional arguments that are discussed herein.  Dr. Kauffman did not move to
dismiss the Vera Complaint.

Search Assistance Act.

The City Defendants further argue that Mr. Vera's substantive due process allegations must be dismissed because they do not sufficiently allege a state-created danger and because there is no allegation that the City directly intervened in the relationship between Delimar and Mr. Vera.  Finally, in both cases, the Defendants argue that the Individual Defendants are entitled to qualified immunity and are, therefore, shielded from liability.

Separate oral arguments were held with respect to both motions.  Because the cases have been consolidated and, obviously, emanate from the same fundamental factual circumstances, the Court is rendering a single Memorandum and Order.

## DISCUSSION

### A.    Standard of Review

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A Rule 12(b)(6) motion will be granted only when it is certain that no relief could be granted under any set of facts that could be proved by the plaintiff.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).

### B.    Personal Rights under the National Child Search Assistance Act

Defendants argue that the Cuevas/Vera claims seeking recovery under the National Child Search Assistance Act ("the Act") must be dismissed because that Act does not confer the right

7

on an individual plaintiff to enforce the statute, thereby eliminating a statutory basis to bring an action pursuant to Section 1983.  The Plaintiffs disagree, arguing that the Act, which sets forth the requirements under which a child reported as missing must be reported to federal and other authorities, unambiguously confers a private right on them, and, particularly, on Delimar Vera.

Section 1983 provides a vehicle for imposing liability against anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by Constitution and laws."  42 U.S.C. § 1983.  In Maine v. Thiboutot, 448 U.S. 1 (1980), the Supreme Court held that Section 1983 provides safeguards for certain rights conferred by federal statutes.  However, in order to seek redress under Section 1983, a plaintiff must assert the violation of a federal *right*, and not merely a violation of federal *law*.  Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 106 (1989).  This, as can be seen most especially in a case such as this one, is not a matter of mere semantics.

In Blessing v. Freestone, 520 U.S. 329, 340-41 (1997), the Supreme Court set forth a three-pronged test to determine whether a statute confers a federal right upon an individual, including whether: (1) Congress intended that the provision in question benefit the plaintiff; (2) the right asserted to be protected is so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the statute unambiguously imposes a binding obligation on the States.[9]  Where a plaintiff successfully establishes these requirements, a rebuttable presumption

---

[9]  The plaintiffs in Blessing were five mothers in Arizona whose children were eligible to receive child support services from the state pursuant to Title IV-D of the Social Security Act.  Blessing, 520 U.S. at 332.  The mothers filed suit claiming that they had an enforceable individual right to have the state's program achieve "substantial compliance" with the requirements of the statute, which provided that in order to qualify for funds under the Aid to Families with Dependent Children Act, a state must certify that it would operate a child support enforcement program that conforms with the requirements set forth in the Social Security Act.

of the existence of a right is established; however, such a claim could still be dismissed if, after

inquiry with respect to congressional intent, a court concludes that Congress "specifically

foreclosed a remedy under § 1983." Blessing, 520 U.S. at 341.

Although the Blessing test at first seems fairly straightforward, subsequent analyses by

the Supreme Court and other courts suggest that in applying the test there are some fine

distinctions that require a court to look not only at the statutory text, but also, at least with this

particular challenge, to the congressional intent underlying the statute as well as the specific

delineation of the claim itself.[10]  To discern congressional intent, a court must consider the text

and structure of the statute.  Gonzaga University v. Doe, 536 U.S. 273, 286 (2002).  That is,

where the text of a statute does not explicitly confer individual rights on a class of beneficiaries,

the analysis to determine whether Congress intended to confer individual rights upon a class of

beneficiaries, a court finds itself needing to at least look to the legislative history and other

indicators of legislative intent.[11]  Gonzaga, 536 U.S. at 285.

---

Id. at 333.  The Blessing Court set forth the three-pronged test outlined in the text above and
concluded that the requirements imposed on the states were precatory, rather than mandatory,
and, therefore, did not confer a private right that could be pursued via Section 1983.  The
Blessing Court also concluded that the requirement that a state "substantially comply" with the
statute in order to avoid additional audits or financial penalties was "designed only to guide the
state in structuring its systemwide efforts at enforcing support obligations" and not to confer
rights directly onto individuals.  Id. at 343.

[10]  The Blessing Court stated that it "was incumbent upon respondents to identify with
particularity the rights they claimed," and that "[o]nly when the complaint is broken down into
manageable analytic bites can a court ascertain whether each separate claim satisfies the various
criteria we have set forth for determining whether a federal statute creates such rights."  Blessing,
520 at 343.

[11]  In this respect, the analysis is analogous to a court's discerning whether a right of
action was implied by Congress.  Gonzaga, 536 U.S. at 286.

9

The most recent Supreme Court case addressing the issue of whether a statute conferred a federal right is <u>Gonzaga University v. Doe</u>, 536 U.S. 273 (2002).   In <u>Gonzaga</u>, the plaintiff was a former university student who claimed that certain rights conferred by the Family Educational Rights and Privacy Act ("FERPA") had been violated.  FERPA is a statute that was enacted pursuant to the spending power of Congress and conditioned the receipt of federal funds by educational institutions on certain requirements relating to the access and disclosure of student educational records.  <u>Gonzaga</u>, 536 U.S. at 278.  The text of the act provided that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . .) of students without the written consent of their parents to any individual, agency or organization."  <u>Id</u>.

The plaintiff, an undergraduate student aspiring to be a teacher, claimed that his rights had been violated because a staff member of the university contacted the state teaching certification agency, identified the plaintiff by name, and informed the agency of unverified allegations made against the plaintiff with respect to an act of sexual misconduct.  <u>Id</u>. at 277.  The plaintiff filed a claim pursuant to Section 1983,  alleging that the university had violated his rights by improperly disclosing information in violation of the requirements of FERPA.

The <u>Gonzaga</u> Court applied the <u>Blessing</u>[12] test, noting that there had been some confusion

---

[12]   The <u>Gonzaga</u> Court also looked to four of its previous decisions regarding this issue in considering the provisions of FERPA.  In <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1 (1981), the Court rejected a claim that the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred enforceable rights because the legislation was enacted pursuant to the spending power and the "typical remedy" for non-compliance would be to terminate funds rather than allow for a private remedy.  In <u>Wright v. Roanoke Redevelopment and Housing Authority</u>, 479 U.S. 418 (1987), the Court found that a provision in the Public

in interpreting <u>Blessing</u> to mean that a plaintiff could enforce a statute under Section 1983 "so long as the plaintiff falls within the general zone of interest that the statute is intended to protect, something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." <u>Gonzaga</u>, 563 U.S. at 283.  The Court went on to clarify the <u>Blessing</u> test, stating that "we now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983." <u>Gonzaga</u>, 536 U.S. at 283.

The <u>Gonzaga</u> Court additionally "reject[ed] the notion that our implied right of action cases are separate and distinct from our § 1983 cases," advising that cases which required an analysis of whether a right of action is implied "should guide the determination of whether a statute confers rights enforceable under § 1983." <u>Gonzaga</u>, at 536 U.S. at 283.  Finding that the provisions of FERPA "entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights," the Court held that no private right was intended. <u>Id</u>. at 287. Thus, <u>Gonzaga</u> clarified the <u>Blessing</u> test by further defining and tightening

Housing Act conferred specific and definite entitlements because it imposed a ceiling for rents charged to low-income people living in public housing projects and stated that residents "shall pay as rent" a specified percentage of its income.  In <u>Wilder v. Virginia Hospital Ass'n</u>, 496 U.S. 498, 502-03 (1990), the Court held that a provision in the Medicaid Act conferred a specific private right on health care providers because it required state plans for medical assistance to provide for payment that was "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."  Finally, in <u>Suter v. Artist M.</u>, 503 U.S. 347, 363 (1992), the Court found that federal reimbursement program set forth in the Adoption Assistance and Child Welfare Act of 1980 did not confer a right enforceable by a class of plaintiffs because a requirement that a state make "reasonable efforts" to prevent or eliminate the need for removal of a child from his or her home did not unambiguously confer a right to enforce the requirement on child beneficiaries of the Act.  In each of these cases, the Court looked to the context of the language purported to confer such a right, as well as the regulations (if any) promulgated to enforce the statute and the intent of Congress as discerned from certain pieces of legislative history.

the requirement that any such right must be unambiguous.  Once a plaintiff has demonstrated the

required elements under <u>Blessing</u>, a court must consider whether, by means of a comprehensive

administrative scheme or other methodology, Congress has implicitly precluded a private right of

action.

In applying the <u>Blessing</u> and <u>Gonzaga</u> tests to the instant case, some guidance is provided

by a relatively recent interpretation of those cases by the Court of Appeals for the Third Circuit.

In <u>Sabree v. Richman</u>, 367 F.3d 180 (3d Cir. 2004), the court considered, as a matter of first

impression, whether, under the federal Medicaid statute, a requirement for states to provide

medical assistance covering medical services from an intermediate care facility for persons with

mental retardation with "reasonable promptness" unambiguously conferred private rights upon

mentally retarded recipients of such services.

To determine the characteristics of an "unambiguously conferred right," the <u>Sabree</u> court

concluded that <u>Gonzaga</u> requires that to confer a private right, a statute must include "rights-

creating language" which clearly imparts an individual entitlement with an "unmistakable focus

on the benefitted class."  <u>Sabree</u>, 367 F.3d at 187 (quoting <u>Blessing</u>, 520 U.S. at 343 and

<u>Gonzaga</u>, 536 U.S. at 287).  As an example, the <u>Sabree</u> court noted that the Medicaid Act

required that "a State plan for medical assistance *must provide* . . . medical assistance . . . to . . .

all [eligible] individuals" and that "such assistance shall be furnished with reasonable

promptness to all eligible individuals."  <u>Sabree</u>, 367 F.3d at 182, n.4, 189.  Applying the clarified

<u>Blessing</u> test, the <u>Sabree</u> court concluded that the statutory language requiring that a state "must

provide" medical assistance services with reasonable promptness met all three prongs of the test

because the plaintiffs (1) were the intended beneficiaries of the statute, (2) the rights the plaintiffs

sought to enforce were specific and enumerated and (3) the obligation imposed upon the states was unambiguous and binding.  Sabree, 367 F.3d at 189.

Having satisfied the Blessing elements, the court then added that under Gonzaga, a further examination was required to ensure that the unambiguous rights asserted were conferred upon the plaintiffs, and not that plaintiffs merely fell within a "general zone of interest that the statute is intended to protect."  Sabree, 367 F.2d at 189-90.  Noting that the statutory requirement that a state plan "must provide" services was analogous to the "no person shall" language determined by the Gonzaga Court to be an example of rights-creating language, the court of appeals found that the statutory language was "mandatory rather than precatory."  Id. at 190.  Furthermore, the court noted, the relevant provisions enumerated that such entitlements be made available to "all eligible individuals," and, therefore, did not focus on the "entity regulated rather than the individuals protected."  Id.  For these reasons, the Sabree court concluded that the plain meaning of the statutory text clearly delineated rights that were both unambiguous and personal in nature, such that personal rights were indeed intended.

The Sabree court finally considered whether the presumption of the availability of Section 1983 as a vehicle for suit was rebutted expressly or by the existence of a comprehensive remedial scheme that was designed to preclude individual suits.  Id. at 193.  After noting that there was no explicit provision excluding individual actions, the court noted that the state faced a "substantial burden" to demonstrate that there was a "comprehensive remedial scheme" which would supplant any remedies under Section 1983.  Finding that the remedial scheme associated with the Medicaid Act fell short of being sufficiently comprehensive, the Sabree court concluded that the plaintiffs had stated valid and enforceable claims.  Id. at 194.

13

Given this guidance, the Court will now apply each prong of the test set forth in <u>Sabree</u> to this case.

1.    **Intended Beneficiaries of the Statute – Existence of an Unambiguous Right**

The Court first considers whether the text and structure of the National Child Search Assistance Act can be interpreted to confer an unambiguous right upon individual citizens, and concludes that it does not.  The statutory regulations governing missing children were originally enacted as a subchapter of the Juvenile Justice and Delinquency Prevention Act, which is included in Title 42 of the United States Code.  The primary provisions, which include Sections 5771 through 5777 of the statute, were enacted in 1984 through amendment of the Juvenile Justice and Delinquency Prevention Act.  <u>See</u> 42 U.S.C. § 5601, Historical and Statutory Notes.[13] These provisions include the following Congressional findings:

> each year thousands of children are abducted or removed from the control of a parent having legal custody without such parent's consent, under circumstances which immediately place the child in grave danger;
>
> many missing children are at great risk of both physical harm and sexual exploitation;
>
> in many cases parents and local law enforcement officials have neither the resources nor the expertise to mount expanded search efforts; [and that]
>
> abducted children are frequently moved from one locality to another, requiring the cooperation and coordination of local, State and Federal law enforcement efforts.

42 U.S.C. § 5771.  Congress additionally found that the National Center for Missing and Exploited Children serves as a national resource center and clearinghouse for data with respect to

---

[13]  At that time, the newly established provisions, along with other amendments to the Juvenile Justice and Delinquency Prevention Act, were called the "Juvenile Justice, Runaway Youth, and Missing Children's Act Amendments of 1984."  42 U.S.C. § 5601, Historical and Statutory Notes.

missing children and that the Center works in partnership with various federal agencies and operates a "national and increasingly worldwide network" to try and locate missing children.  Id.

Section 5773 establishes the position of an Administrator who is charged with various responsibilities, such as the issuance of rules necessary to coordinate the activities among federally funded programs relating to missing children.  42 U.S.C. § 5773.  For each of the fiscal years 2004 through 2008, funds in the amount of $20,000,000 were appropriated to the Administrator to carry out these responsibilities.  Id.  In turn, the Administrator is authorized to "make grants to and enter into contracts with the Center and with public agencies or nonprofit private organizations, or combinations thereof, for research, demonstration projects, or service programs. . . ."  42 U.S.C. § 5775.

The specific provisions under which the Plaintiffs here assert their claims, however, were not enacted as part of the Juvenile Justice and Delinquency Prevention Act of 1974.  Rather, the sections of the statute relevant to the Plaintiffs' complaints were added when the National Child Search Assistance Act of 1990, which was part of the Crime Control Act of 1990, was enacted.  This statute consists of two provisions.

Section 5779 of the Act provides that "[e]ach Federal, State, and local law enforcement agency shall report each case of a missing child under the age of 21 reported to such agency to the National Crime Information Center of the Department of Justice," and Section 5780 states that "[e]ach State reporting [such information] shall ensure that no law enforcement agency within the State establishes or maintains any policy that requires the observance of any waiting period before accepting a missing child or unidentified person report."  42 U.S.C. §§ 5779-80.  Section 5779 also provides that the Attorney General "may establish guidelines for the collection

of such reports including procedures for carrying out the purposes of this section . . . ."  42

U.S.C. § 5779(b).  There is no formal statement of policy in this portion of the statute.

Based on a review of the express statutory language, the Court concludes that there is no

indication of an intent to establish an unambiguous individual right to enforce the statute.  The

focus of the statute is about streamlining the process through which information about missing

children is collected and may be shared.  To be sure, lawmakers and the public at large would

hope that children such as Delimar and their parents would benefit from the centralization of the

data collection effort.  However, the case law is clear that absent specific statutory language or

other specific intent to confer an unambiguous individual right, no individual right can be

inferred even if an individual is a beneficiary of the statute.  After reviewing an abundance of

documents relating to the legislative history of the National Child Search Assistance Act, there is

no discernable  indication that Sections 5779 and 5780 were enacted for any purpose other than

to improve the tracking and investigation of cases of missing children.

## 2.    Binding and Mandatory Obligation on States

The Court must next consider whether the Act imposes a binding and mandatory

obligation on the states in such a way as to make the Act enforceable by individual citizens.

After reviewing the Act and, at the urging of the litigants here, its underlying legislative history,

the Court concludes that there is no binding obligation that would warrant private enforcement.

Relying primarily on Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460

(1989), the Plaintiffs argue that the use of the word "shall" in Section 5779(a) of the Act,[14] when

---

[14]  Ms. Cuevas specifically argues that the requirement that "each . . . local law
enforcement agency *shall* report each case of a missing child . . . ." is mandatory rather than
precatory and that, given the findings, missing children and their parents are unquestionably the

read in conjunction with the Congressional findings, supports a reading that the statutory requirements are mandatory rather than discretionary and are a clear directive that binds state and local law enforcement agencies. Plaintiff's Answer to Motion to Dismiss at 13. In Thomson, the Court was asked to determine whether state prison regulations guiding a prison officer's discretion in disallowing visitors conferred a liberty interest protected under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. In analyzing the issue, the Thompson Court stated that a "protected liberty interest [is created] by placing substantive limitations on official discretion." Thompson, 490 U.S. at 462. Thus, a liberty interest could arise where a state established "substantive predicates" to govern official decision-making. Id.

The Court disagrees that Thomson is dispositive here. As discussed above, Section 5779(b) allows for the Attorney General to establish guidelines for collecting the reports submitted pursuant to Section 5779(a), and Section 5779(c) imposes an obligation upon the Attorney General to publish an annual statistical summary of the reports received under the Act. 42 U.S.C. § 5779. This provision suggests that Congress intended for the enforcement of the obligations imposed by the Act to rest appropriately with the Attorney General.

Moreover, without endorsing resort to legislative history, the Court notes that the legislative history that Plaintiffs suggest provides insight does not support finding an individual right. A report from the House of Representatives' Committee on the Judiciary, in recommending that the representatives vote in favor of the amendments, stated that the purpose of the amendments was "to require Federal, state and local law enforcement agencies to enter missing children reports and unidentified person reports in the National Crime Information

_____

intended beneficiaries.

Center immediately after they are received, without any waiting period." H.R. REP. No. 101-872, at 2. According to this report, the bill was said to be "intended to deal with a situation in which agencies are observing (usually informally) a waiting period before entering missing child reports in the NCIC." H.R. REP. 101-872 at 2 (1990). Aside, perhaps, from noting that "if a missing child is in danger, that danger is most extreme within the first 48 hours after his or her disappearance," the report contains no additional information with respect to whether the statute was intended to confer individual rights.

The Congressional Record for the Senate relating to the introduction of Sections 5779 and 5780 suggests that these provisions were proposed to "offer an amendment that would greatly facilitate search efforts for missing children." 136 CONG. REC. S9119, 9123 (daily ed. June 11, 1990) (statement of Senator McConnell). The amendment was offered to remedy "gaps . . . in the system," and mention was made that "missing children and their families suffer from the inefficiencies of an underutilized system." Id. Finally, the amendments were said to address "the pressing need for uniform, nationwide access to all missing children reports," and would be "the impetus needed to coordinate local, State, and national resources." Id. at 9124.

At a hearing of the House of Representatives Subcommittee on Civil and Constitutional Rights concerning the version of the statute proposed in the House of Representatives (H.R. 4407),[15] the bill was stated to represent "an effort to create uniformity and greater efficiency in the reporting of missing children cases," and would enable "law enforcement agencies across the State lines to access information on missing children," establishing "[a] more efficient system of

_____

[15] The bill proposed as H.R. 4407, which was the substance of the hearing, represented the later version of the bill, as the Act was adopted just over a month later.

reporting disappearances. . . ."  <u>National Child Search Assistance Act of 1990: Hearing Concerning H.R. 4407</u>, 101st Cong. 1 (1990) (statement of Honorable Don Edwards, chairman of the subcommittee).  According to a witness advocating passage of the bill, the purpose of the provision mandating immediate reporting was said to be "because the whole premise is that by losing 24, 48, 72 hours, we are putting the child at risk."  <u>Id</u>. at 27 (statement of Ernest E. Allen, President of the Center for Missing and Exploited Children).

Significantly, the version of the Act presented in the hearing on H.R. 4407 included a provision that "[a]ny State not complying with the provisions of subsection (a) shall be denied any grant, cooperative agreement, or other assistance authorized by the Missing Children's Assistance Act."  <u>Id</u>. at 3.[16]   During the hearing, this provision was discussed in conjunction with the provision that the Attorney General establish guidelines for the collection of missing children reports, and considerations about whether a state would lose a significant amount of funding if it failed to comply. <u>Id</u>. at 20 (statement of John R. Rabun, Jr., Vice President, National Center for Missing and Exploited Children).

The legislative history presented here suggests that these provisions were enacted with the purpose of improving the success rate in locating missing and abducted children by establishing a more coordinated and efficient use of available resources.  Although the children and their families are potential beneficiaries of such streamlining, both the text of the statute and the legislative intent that can be gleaned from reports and hearing testimony supports a finding that this Act was intended to help speed up and/or effect the recovery of missing children who might

---

[16]  This language is not in the actual text of the Act, and was, presumably, removed during the final legislative process.

be taken across state lines by requiring that there be a consistent method of collecting statistics and data regarding those children, and then sharing that data among interested law enforcement agencies. The Attorney General is responsible for establishing those guidelines, and there is nothing in the statute to suggest that an individual citizen has a right to enforce them.

This conclusion is further bolstered by two additional cases. First, Castle Rock v. Gonzales, 125 S. Ct. 2796 (U.S. 2005),[17] a case which suggests that the use of the word "shall" does not establish a per se mandatory obligation. Additionally, Three Rivers Center for Independent Living v. Housing Authority of Pgh., 382 F.3d 412 (3d Cir. 2004), provides an example of when such mandatory language in a statute may be construed not to confer a private right.

In Castle Rock, the plaintiff obtained a restraining order from a Colorado state court that limited the times during which her husband could visit with the couple's three daughters. When her husband came and took their daughters without advance notice, the plaintiff went to the police and requested that they enforce the restraining order and retrieve and return her daughters. The plaintiff was advised by the police that there was no action that could be taken and that she should call back if the children were not returned by 10:00 p.m. that evening. At 10:00 p.m., she was again told to wait until after midnight to call back. Ultimately, at 3:20 the following morning, when the plaintiff's husband arrived at the police station, the children were discovered to have been murdered by the husband. The issue before the Supreme Court was whether, by

---

[17] The Plaintiffs argue that Castle Rock is not relevant in assessing whether the National Child Search Assistance Act confers an individual right because the plaintiff in Castle Rock asserted a procedural due process constitutional violation, and not a statutory violation. Oct. 31, 2005 Tr. at 22:14-17. However, the concept of finding a property right and an intended statutory right is sufficiently analogous to provide some guidance here.

failing to enforce the restraining order when they had reason to believe it had been violated, the police had violated the plaintiff's property interest in having the order enforced.[18]  Castle Rock, 125 S. Ct. at 2800.

In analyzing the issue as to whether the plaintiff had a "legitimate claim of entitlement" to having the order enforced, the Castle Rock Court looked to the preprinted notice to law enforcement personnel that was stamped on the back of the order.  This notice stated that "a peace officer *shall* use every reasonable means to enforce a restraining order," that "a peace officer *shall* arrest" a person upon probable cause that the person had violated the order, and that "a peace officer *shall* enforce a valid restraining order" regardless of whether a record of such order existed.  Castle Rock, 125 S. Ct. at 2805.  The Court first concluded that because there is a "well established tradition of police discretion," it did not believe that the provisions of the Colorado law, as stated on the restraining order, were truly mandatory.  Id at 2805-06.  Moreover, and perhaps most importantly in this instance, the Court noted that even had the provisions been truly mandatory, the act of requiring certain actions by government employees did not, in and of itself, demonstrate that a personal right of enforcement had been conferred upon the plaintiff.  Id. at 2808.  These obligatory actions, the Court stated, "can serve various legitimate ends other than the conferral of a benefit on a specific class of people."  Id.

In Three Rivers, a class of disabled plaintiffs filed suit seeking declaratory and injunctive relief compelling a housing authority to comply with regulations promulgated by the Department

---

[18]  The incident giving rise to this action occurred in mid-1999.  There is no indication that the plaintiff ever argued that the police failed to properly report her daughters as missing or that the defendants had violated her and her daughters' rights under the National Child Search Assistance Act.

of Housing and Urban Development.  <u>Three Rivers</u>, 382 F.3d at 415.  The regulations directed a

public housing authority that received federal funds, when constructing new housing units, that

those units "*shall* be designed and constructed to be readily accessible to and usable by

individuals with handicaps."  <u>Id</u>. at 429.  The defendants moved to dismiss the complaint,

arguing that the statute did not confer a private right to enforce the statute upon disabled

plaintiffs.

        In analyzing the issue, the <u>Three Rivers</u> court concluded that the existence of a private

right to enforce a regulation depended upon whether the statute enabling the regulations afforded

such a right.   It then went on to analyze the statute and its corresponding regulations and

concluded that because the mandate was "not couched in terms of any beneficiary's entitlement

but aims at the fund recipient's conduct," the regulations spoke to the regulated entity rather than

focusing on the beneficiary.  <u>Id</u>. at 429.  Thus, there was no private right to enforce the

regulation.

        In this case, Ms. Cuevas and Mr. Vera vigorously argue that the elimination of any use of

discretion by local law enforcement agencies, accompanied by a lack of a clear enforcement

mechanism set forth in the statute, bespeak a clear intent to allow individuals to enforce the

statute.  <u>See</u> <u>Oct. 31 Tr.</u> at 19:9-25; 20:1-10.  However, the legislative intent discussed above,

accompanied by the lack of any statutory language that even suggests an individual child or his or

her family would have a right to enforce the statute, weighs against clinging wishfully to the

concept that the absence of discretion is equivalent to an individual right of enforcement.  Thus,

the mandatory nature of the Act does not, in and of itself, support a finding of an individual right.

      3.      **Congressional Preclusion**

Even where an individual right is found to arise from a statute, that right may be precluded to the extent that Congress, either expressly or implicitly, forecloses a private remedy. Blessing, 520 U.S. at 341.  If recourse to Section 1983 is not explicitly forbidden in a statute, the existence of "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983" is sufficient.  Id.  Because the Court finds that there is no individual right to enforce the Act, the issue of Congressional preclusion need not be addressed here.

### C.      Agency Defendants Not Required Reporters

The City Defendants next argue that even if Ms. Cuevas has successfully stated a claim under the National Child Search Assistance Act, the Individual Defendants cannot be held liable because, as employees of the Fire Department and Office of the Medical Examiner, the mandate did not apply to them because they were not "law enforcement officers."  Defendants' Memorandum in Support of Motion to Dismiss at 13.  In addition, Dr. Kauffman (who is separately represented) notes that other district courts within the Third Circuit that have stated that only governmental employees "whose duty it is to preserve the peace" or "to be vigilant in discovering violations of the criminal laws and ordinance to arrest offenders" are considered to be "law enforcement officers."  See Imperial Casualty & Indemnity Co. v. Home Ins. Co. of Manchester, 727 F. Supp. 917, 918 (M.D. Pa. 1990).  Dr. Kauffman hastens to point out that the Pennsylvania statute defining persons required to report suspected child abuse, 23 Pa. C.S.A. § 6311, the positions of "medical examiner" and "peace officer or law enforcement official" are listed separately, suggesting that the two are not the same.  Because the Court concludes that the Act affords the Plaintiffs no private right of enforcement, this issue will not be addressed.

**D.     Due Process**

The Plaintiffs' theories of liability diverge with respect to their claims for due process under the Fourteenth Amendment.  Ms. Cuevas argues that because the Act establishes a methodology regarding the reporting of missing children with which state and local police officers are obliged to comply, even if no private right of action is conferred by the statute, a failure to comply with the reporting requirements constitutes a violation of the Plaintiffs' procedural due process rights.  In addition to adopting this argument and claim, Mr. Vera asserts that the Defendants' actions deprived him of his interest, guaranteed by the Fourteenth Amendment, in the companionship, care, custody and control of Delimar and his and Delimar's liberty interest in preserving her life and physical safety.

**1.     Procedural Due Process**

Because the National Child Search Assistance Act divests local law enforcement agencies of any discretion (i.e., in choosing to report, what information must be reported, and when), Ms. Cuevas argues that an individual right to due process necessarily arises from the Act. The Defendants respond that such a claim would be precluded by <u>Castle Rock</u>, 125 S. Ct. at 2796. Defendants specifically argue that this case is analogous to <u>Castle Rock</u> because as is the case here, the mandatory language of the statute at issue in that case warranted an allowance for some discretion.

Statutes requiring mandatory action by government actors for the benefit of serving the public are not necessarily intended or construed to confer a right on a particular individual.  <u>See</u>, <u>e.g.</u>, <u>Sandin v. Conner</u>, 515 U.S. 472, 481-82 (1995) (finding that mandatory language used in prison regulations did not confer property interest on individual prisoners, but rather were

24

Case 2:05-cv-03749-GEKP   Document 36   Filed 08/11/06   Page 25 of 46

enacted for the purpose of providing guidance to correctional officers regarding administration of prison); see also Castle Rock, 125 S. Ct. at 2808 ("[m]aking the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people").

Here, the "procedure" to which the Plaintiffs refer is the reporting of the missing child to the National Child Information Center. As has already been discussed, the purpose of such a procedure, which is to be monitored by the Attorney General, is to streamline and coordinate the compilation of information about missing children to utilize law enforcement resources in an efficient, and, hopefully, successful manner. Although missing children and their families will benefit from efficient use of available resources, there is no indication that the provisions of the Act were intended to confer private, individual rights on such beneficiaries of the Act. Because the National Child Search Assistance Act ultimately provides for an efficient use of law enforcement resources and benefits the general public, the Court concludes that there is no individual property interest that would give rise to a procedural due process claim.

## 2.   **Substantive Due Process**

In Counts 3 and 4 of his Complaint, Mr. Vera argues that the Individual Defendants and the City violated his and Delimar's fundamental due process rights bestowed by the Fourteenth Amendment.[19] Mr. Vera also alleges a substantive due process violation respecting his

---

[19] At oral argument, Defendants' counsel asserted that only Mr. Vera has been implicated as a plaintiff respecting these two counts. Jan. 25, 2006 Tr. at 42:18-22. However, the Vera Complaint is not as clear as counsel suggests. In each of these counts, Mr. Vera asserts that the individual and City defendants "deprived Pedro Vera and Delimar Vera of their federal constitutional rights under the Due Process Clause of the Fourteenth Amendment," and judgment respecting these counts is requested in favor of both Mr. Vera and Delimar. Vera Compl. at ¶¶ 64, 70. Construing the text of the complaint on behalf of Mr. Vera, the Court will assume that

relationship with Delimar, including his interest in the companionship, care, custody and control of Delimar, his ability to make decisions concerning the rearing of Delimar and his liberty interest in preserving Delimar's life and physical safety.  Vera Compl. at ¶ 71.  In response, the Defendants argue that Mr. Vera's Fourteenth Amendment due process claim fails because (1) there is no constitutional right to be rescued from harm caused by a third party and (2) there is no "blanket Fourteenth Amendment right" to a child's companionship.  Defendant's Memorandum at 7.

a.     **State Created Danger/Failure to Rescue from Pre-Existing Harm**

Counts 3 and 4 of Mr. Vera's Complaint allege that "[a]s a result of the deliberate decisions of the above-referenced Individual Defendants in falsely and erroneously determining that Delimar Vera was 'deceased,' as well as refusing and/or neglecting to perform any actual investigation into the circumstances surrounding her disappearance," Mr. Vera was "denied his fundamental constitutional rights in his relationship with his daughter, . . . including, by not limited to, his interest as a parent in the companionship, care, custody and control of [Delimar], of  the right to make decisions concerning the rearing of [Delimar]; and the cognizable liberty interest in preserving the life and physical safety of [Delimar]".  Vera Compl. at ¶¶ 66, 72.

Mr. Vera further alleges that as "a direct and proximate result of the wrongful conduct engaged in [by the Defendants], Pedro Vera suffered grievous physical pain and emotional trauma, loss of the society of [Delimar], for approximately six years, violations of his

--------------------------------------------------------

Mr. Vera asserts the substantive due process claim alleging a state-created danger on behalf of himself and Delimar.  The second portion these allegations, involving a liberty interest in the right to care, custody and control of a child, shall be considered filed on behalf of Mr. Vera only.

constitutional rights under the Due Process Clause of the Fourteenth Amendment, loss of earning

power, as well as a loss and diminution of his ability to enjoy the pleasures of life." Vera Compl.

at ¶¶ 67, 73.

As a general rule, a state's failure to protect an individual against private violence is not

sufficient to support a claim for a due process violation. Brown v. Pennsylvania, 318 F.3d 473,

478 (3d Cir. 2003).[20]  There are, however, two circumstances under which a constitutional

violation can result from an exercise of government power over an individual. Id.  First, if the

government "so restrains an individual's liberty that it renders him unable to care for himself,

and at the same time fails to provide for his basic human needs," a "special relationship" between

the government and the citizen arises and a constitutional violation may be found if the state

restraint exposes an individual to harm. Id.  Liability may also arise in the absence of a special

relationship when the state, through its affirmative conduct, creates or enhances a danger for the

individual. Id.

In this case, there is no allegation that either Mr. Vera or Delimar were restrained by the

City and that the City then failed to provide for his or her basic needs.  In fact, during the oral

argument, counsel for Mr. Vera argued that liability in this case is not grounded on any asserted

"special relationship" involving custody of the state over Delimar or Mr. Vera, but rather hinges

---

[20]  In Brown, the plaintiffs were the parents of a one-year old child who died after choking
on a grape.  The plaintiffs alleged that the City was at fault because the emergency medical
technicians who had been dispatched to assist the child were delayed in providing assistance.
Brown, 318 F.3d at 476.  The Brown court analyzed the issue pursuant to the state created danger
doctrine set forth in DeShaney v. Winnebago County Social Svcs, 489 U.S. 189 (1989), and
concluded that the delay in providing rescue services did not rise to the level of "shocking the
conscience" of the court, and affirmed the lower court's entry of summary judgment in favor of
the defendants.

on whether the Defendants created an unreasonable danger for the Plaintiffs because their failure to report her as missing enlarged the time of her false imprisonment. Jan. 25, 2006 Tr. at 29:20-24. Thus, the first type of liability need not be considered here, and the Court will only consider the latter state-created danger theory of liability.

The circumstances under which a government or government actor may be held liable for danger to an individual were set forth in DeShaney v. Winnebago County Social Svcs, 489 U.S. 189 (1989). In DeShaney, the minor plaintiff, Joshua DeShaney, and his mother filed a Section 1983 claim against a state's social service authorities for failing to remove Joshua from his home despite repeated and verified complaints that Joshua's father was physically abusing him. DeShaney, 489 U.S. at 193-94. The Section 1983 claim asserted that by failing to intervene and ignoring the obvious signs and symptoms of abuse, the defendants had deprived Joshua of his liberty without due process of law in violation of his rights under the Fourteenth Amendment. Id. at 193. Thus, the Court considered whether a state actor's failure to provide an individual with adequate protective services could amount to a deprivation of constitutional rights. Id. at 194. In affirming the dismissal of the case, the Court concluded that the failure of a state to protect an individual against private violence does not constitute a violation of the Due Process Clause. Id. at 197. The Court also found that only where a state restrains an individual's liberty by an affirmative exercise of its power would the failure to provide for the individual's basic human needs amount to a constitutional violation. Id. at 200.

Seven years later, in Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996), the Court of Appeals for the Third Circuit adopted the DeShaney "state created danger" theory. In Kneipp, the plaintiff and her husband were stopped by the police when they were walking home together late

at night after having been at a bar drinking.  Mrs. Kneipp was heavily intoxicated and had difficulty standing.  After some time had passed, Mr. Kneipp became concerned for the welfare of his young son who was at home, and, after discussing the matter with the police, left to go home and care for the child, believing that the police would either arrest his wife or take her to the hospital until she became sober.  Kneipp, 95 F.3d at 1202.  However, after Mr. Kneipp left, the police released Mrs. Kneipp and, despite her extremely intoxicated state, left her to walk home on her own.  Id. at 1202.  Mrs. Kneipp subsequently fell down an embankment, lost consciousness, suffered severe hypothermia and became permanently disabled.  Id. at 1203.  Mrs. Kneipp filed a Section 1983 claim against the police officers who had stopped the Kneipps that night and the City of Philadelphia, claiming that her rights under the Fourteenth Amendment to substantive due process and her liberty interest in personal security had been violated.

After framing the question as "whether the state actors affirmatively acted to *create* plaintiff's danger, or to render him or her more *vulnerable* to it," the Kneipp court stated that there are four common elements to predicate constitutional liability on a state-created danger theory.  Kneipp, 95 F.3d at 1208.  The Kneipp court concluded that the evidence submitted was enough to establish a constitutional claim because the police officers "affirmatively placed [Mrs. Kneipp] in a position of danger," affirming the entry of summary judgment on behalf of the defendants.  Kneipp, 95 F.3d at 1211.

Since Kneipp, the Court of Appeals for the Third Circuit has held that while the "affirmative placement" of an individual in a position of danger may occur as an affirmative act or omission, the dispositive factor to assess whether a state created danger existed is "whether the state in some way placed the plaintiff in a dangerous position *that was foreseeable*."  Morse v.

Lower Merion Sch. Dist., 132 F.3d 902, 915 (3d Cir. 1997) (emphasis added);[21] Tazioly v. City

of Philadelphia, No. 97-1219, 1998 WL 633747, at * 7 (E.D. Pa. Sept. 10, 1998).[22]  Then, in

2003, the court acknowledged that its interpretation and application of the state-created danger

doctrine as adopted in Kneipp was, in light of the post-Kneipp decision of County of Sacramento

v. Lewis, 523 U.S. 833 (1998),[23] in need of an update.  That update came in the case of Schieber

---

[21]  Mr. Vera cites to Morse for the proposition that the state created danger theory may be established by an omission, rather than an act.  Vera Response Memorandum at 5.  In Morse, the husband and child of a day care teacher who was shot and killed in the presence of her class filed a Section 1983 claim against the public school for failing to adhere to its policy of keeping the back doors to the school locked.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 904 (3d Cir. 1997).  The court found that no liability could lie under the state created danger theory because there was no direct causal connection between the acts or omissions of the school and the harm, and that it was not the act or omission of the state actor that directly placed the victim in harm's way.  Morse, 132 F.3d at 915.  In the present case, Mr. Vera tries to meet the Morse analysis by alleging that "but for" the omission of the Defendants, his parental rights would not have been violated because Ms. Correa would have been caught sooner.  While the Court understands why Mr. Vera would need to make such an assertion, in fact it is little more than a supposition that has no basis in the actual facts of this case, and the Court finds that the theoretical causal association is just that – theoretical – and too attenuated to satisfy the articulated standards.

[22]  In Tazioly, the plaintiff was a minor child who had been severely abused by his mother and her boyfriend.  Workers at the Pennsylvania Department of Public Welfare, "despite . . . mounting evidence that [the child's mother] posed a grave threat" to the child's welfare, made the decision to remove the child from foster care and return him to his mother's home.  Tazioly v. City of Philadelphia, No. 97-1219, 1998 WL 633747, at * 5 (E.D. Pa. Sept. 10, 1998).  In finding that liability under the state created danger theory was properly asserted, the court noted that because the Department knew of the mother's "propensities for violent and bizarre behavior," the risk of harm to the child was foreseeable.  In this case, the foreseeability of the harm at the hands of a previously unknown arsonist-kidnapper is so much more questionable as to make Tazioly unhelpful to Plaintiffs' case.

[23]  In Lewis, the Supreme Court considered the substantive due process claim of the parents of an individual who was killed during a high-speed automobile chase.  County of Sacramento v. Lewis, 523 U.S. 833, 836 (1998).  In finding that the individual's due process rights had not been violated, the Court held that "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation."  Lewis, 523 U.S. at 836.

v. City of Philadelphia, 320 F.3d 409 (3d Cir. 2003).

 In Schieber, the parents of a woman who had been raped and murdered sued the City of
Philadelphia and several of its police officers.  The plaintiffs alleged that the police officers
violated their daughter's substantive due process rights by failing to break down her apartment
door after a neighbor called the police and reported that he had heard screams for help coming
from the apartment.  Schieber, 320 F.3d at 411.  Evaluating the claim, the Schieber court noted
that under Lewis, the touchstone of due process was "protection of the individual against
arbitrary action of the government."  Schieber, 320 F.3d at 417.  The court further noted that the
standard to be applied where a substantive due process claim grounded on executive action is
alleged is that the action be "so ill-conceived or malicious that it 'shocks the conscience.'"  Id.

 The court of appeals further delineated the parameters of the state-created danger
exception in two recent cases – Bright v. Westmoreland Cty, 443 F.3d 276 (3d Cir. 2006) and
Sanford v. Stiles, No. 04-4496, 2006 WL 2161404 (3d Cir. Aug. 2, 2006).  In Bright, the
plaintiffs were the parents of an 8 year-old girl who was murdered by an individual who pled
guilty to corrupting the morals of the plaintiffs' 12-year old daughter and was under court order
to have no contact with the victim and no unsupervised contact with any minor.  Bright, 443 F.3d
at 278.  After the individual was seen in a department store with the 12-year old victim, probation
officers prepared a violation report and requested a hearing to revoke probation.  Id. at 278-79.
While the preparation of these reports and requests took place over a period of approximately
three months, the father of the girls called one of the police officers who had previously dealt
with the individual/abuser shortly after the incident at the department store occurred and asked
that the individual be arrested.  Id. at 279.  Although the officer indicated that immediate action

would be taken, none was, and before the probation revocation hearing occurred, the individual

shot and killed the 12-year old girl's younger sister, the 8 year-old.  Id.  The plaintiffs sued the

probation and police officers, alleging that "the affirmative acts and/or deliberate failure to

enforce . . . the court-ordered conditions of probation" constituted a state-created danger that

resulted in the death of the murder victim, violating her substantive right to due process under the

Fourteenth Amendment.[24]  Id.

In analyzing the claim, the court set forth the "essential elements" of a state-created

danger claim to be (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state

actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the

state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's

act," or a "member of a discrete class of persons subjected to the potential harm brought about by

the state's actions," as opposed to a member of the public in general; and (4) a state actor

affirmatively used his or her authority in a way that created a danger to the citizen or that

rendered the citizen more vulnerable to danger than had the state not acted at all.  Bright, 443

F.3d at 281.  The court stressed that under this element of a state-created danger claim, liability is

predicated upon affirmative acts which work to the plaintiffs' detriments in terms of exposure to

danger.  Bright, 443 F.3d at 282.  The Bright court further noted that it is the misuse of state

authority, rather than a failure to use it, that would violate the Due Process Clause.  Id.

The case law discussed above provides sufficient guidance for the Court to apply the

state-created danger test articulated in Bright to the present case.

––––––––––––––––

[24]  The Bright plaintiffs also filed state law claims for wrongful death and survival, as
well as assault and battery claims, against the individual who committed the murder.

32

The Defendants argue that the foreseeability feature of the test is not met here because they could not have known that Ms. Correa was going to set a fire at the Cuevas home and, thus, they could not have prevented the arson-to-kidnapping event from happening.  Jan. 25 Tr. at 22:1-5.  In response, Mr. Vera asserts that he is not alleging that the fire and kidnapping itself could have been prevented, but rather that it is the Defendants' behavior during the aftermath of the fire that caused the harm.  Essentially, Mr. Vera argues that the scientific and forensic evidence that the fire was not accidental, coupled with the facts that Ms. Cuevas told the Defendants that Delimar was not in her crib when Ms. Cuevas looked into the room at the start of the fire and that no remains were ever found, add up to foreseeability in this case.  Jan. 25 Tr. at 28:9-15.

Assuming, as the Court must, all of these allegations to be true, they alone are not sufficient to support finding that it would have been foreseeable for the City officials to realize or even suspect that Delimar had been taken.  While the circumstances arguably could have given the officials pause to interview other witnesses or ask further questions, the ultimate conclusion that Delimar was not in her crib because she was missing and had been kidnapped, given the absence of any other facts at that time, is too attenuated for the Court to conclude that the fact of the kidnapping was foreseeable.

The Court must next consider whether the allegations, taken as true, would exhibit a degree of culpability by the Defendants that would "shock the conscience."  The Supreme Court has stated that "the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability."  Lewis, 523 U.S. at 848.  On one end

of the spectrum, liability for negligently inflicted harm is "categorically beneath the threshold of constitutional due process." Lewis, 523 U.S. at 849. On the other end, conduct that is "intended to injure in some way unjustifiable by any government interest" is the sort that would most likely rise to the conscience-shocking level. Id. Where behavior by a government actor falls in the middle range, such as recklessness or gross negligence, a court is confronted with a closer call. Id. Thus, to determine whether a government action was arbitrary in the constitutional sense, a court must consider the context in which the alleged action took place. Schieber, 320 F.3d at 417; see also Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999).

The "shock the conscience" standard in the context of a state-created danger claim has been very recently analyzed by the Court of Appeals for the Third Circuit in Sanford v. Stiles, No. 04-4496, 2006 WL 2161404 (3d Cir. Aug. 2, 2006). In Sanford, the plaintiff was the mother of a 16-year old boy who committed suicide a short time after he had spoken with a high school guidance counselor who had inquired as to the boy's welfare and whether he had any plans to harm himself. Sanford, 2006 WL 2161404at * 3. The boy, Michael Sanford, had sent a note to a former girlfriend in which he said "I've heard 3 diff[erent] stories about you & Ryan. The one I heard *almost made me want to kill myself*." Id. at * 2. The former girlfriend went to a guidance counselor with the note, expressing concern for Michael, as well as indicating that she wanted him to stop "bugging" her. Id. After reviewing the note, a guidance counselor, Pamela Stiles, called Michael into her office and had a discussion with him to explore whether he was upset. Id. Ms. Stiles expressly asked Michael if he had any plans to harm himself, to which he responded "definitely not." Id. Despite giving this answer, about one week after this meeting,

Michael Sanford killed himself.

Mrs. Sanford then filed a claim against Ms. Stiles and the school district in which she alleged that the defendants were liable for Michael's death under a state-created danger theory for constitutional violations pursuant to 42 U.S.C. § 1983. Id. at * 3.  In affirming the district court's entry of summary judgment in favor of the defendants, the Sanford court concluded that Mrs. Sanford had not established that Ms. Stiles acted with the requisite degree of culpability to sustain a claim grounded on a state-created danger theory.[25]  In so concluding, the court set forth a thorough, chronically summarized history of its jurisprudence on the standard of culpability respecting state-created danger claims, and concluded that there is a continuum upon which the degree of culpability required to establish such a claim must be measured, relating to the circumstances of each case.

The time within which the government actors had to respond to an incident is of particular significance.  For example, the Sanford court stated that "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate increases." Id. at * 8.  The court then concluded that while intent to cause harm must be found in a "hyperpressurized environment," where officials are afforded the luxury of a greater degree of deliberation and have time to make "unhurried judgments," deliberate indifference is sufficient to support an allegation of culpability.  Id. at *8.  The court further noted  "the possibility that deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that is should be known."  Id.  Finally, where the circumstances require a state actor to

---

[25]  The Court notes that the Sanford court based its affirmance on the second and fourth prongs of the Bright test.  Sanford, 2006 WL 2161404, at * 4.  For purposes of this analysis, the culpability standard developed in Sanford is most relevant and helpful.

make something less exigent than a "split-second" decision but more urgent than an "unhurried judgment," i.e., a state actor is required to act "in a matter of hours or minutes," a court must consider whether a defendant disregarded a "great risk of serious harm rather than a substantial risk." Id. at * 8.[26]

The Court finds that the circumstances in this case, as alleged in Mr. Vera's Complaint,[27] are not sufficient to support a finding that the alleged behavior of the Defendants rises to the level of "shocking the conscience" in a constitutional sense. The substance of the allegations supporting a claim that Mr. Vera's substantive right to liberty with respect to the rearing of Delimar was violated include assertions that the City officials involved in quelling the fire and subsequently investigating its cause did not, despite being told that Delimar was not in her crib at the time the fire occurred, adequately or diligently investigate the fire scene to discover that the fire had been set, and did not conduct an adequate search for Delimar's remains before declaring

---

[26] In developing this last standard to measure culpability, the Sanford court merged its prior holdings in Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999), and Ziccardi v. City of Philadelphia, 288 F.3d 57, 58-59 (3d Cir. 2002). Miller involved a plaintiff's objections to the acts of a social worker which led to the removal, on an emergency basis, of children from the custody of their mother. There, the court set forth a standard of fault between deliberate indifference and purpose to cause harm, defining the standard to be "gross negligence or arbitrariness that indeed shocks the conscience." Sanford, 2006 WL 2161404 at * 6. Ziccardi involved a plaintiff claiming that the negligent behavior of two paramedics rendered the plaintiff a quadriplegic. The Ziccardi court determined that the standard set forth in Miller "was not intended as a 'precise articulation,' that arbitrariness is a general requirement for substantive due process violations and that gross negligence encompasses a lower level of intent than deliberate indifference," and then concluded that in situations where an instantaneous decision is not necessary but where a state actor "does not have the luxury of proceeding in a deliberate fashion . . . a plaintiff must show that the defendant consciously disregarded, not just a substantial risk, but a *great* risk of serious harm. . . ." Sanford, 2006 WL 2161404, at * 7 (emphasis in original).

[27] The Court notes that Ms. Cuevas's Complaint does not allege a substantive due process violation, but rather only makes mention of a procedural due process violation. Thus, Ms. Cuevas's complaint is not implicated in this part of the Court's analysis.

that she had died in the fire.  <u>Vera Compl.</u> at ¶¶ 24 - 34.  The Plaintiffs then assert that as a result

of these alleged deficiencies, the Defendants perpetuated or created a dangerous situation where

Delimar was falsely imprisoned and kept away from her parents for a period of six years.  <u>Jan.

25, 2006 Tr</u>. at 25:12-24.  The purported result of the harm, according to these allegations, is

simply too attenuated to relate back to the alleged actions of the Defendants.  Moreover, even

assuming that the behavior of the Defendants fell into the middle category of not requiring an

instantaneous decision (such as the opportunity to investigate the fire afterwards), the allegations

do not support an assertion that the Defendants acted with disregard to a great risk of serious

harm to Delimar.  To find the Defendants' behavior so reckless as to shock the conscience, the

Court is required to accept the implicit presumption that had the Defendants continued on with a

further investigation and conducted that investigation properly, Delimar would have been located

and returned to her parents some time notably sooner than after a six year period.  The Court

declines the invitation to accept such a presumption, and finds that the behavior alleged in the

Vera Complaint really amounts to allegations of negligence on the part of the Defendants.

Therefore, the Court finds that the allegations in the Vera Complaint do not rise to the level of

shocking the conscience in support of a substantive due process violation.

        The Court must next consider the third element set forth under <u>Bright</u>, which requires a

consideration of the relationship between Mr. Vera and Delimar and the Defendants.  That is, the

Court must consider whether Mr. Vera and Delimar, as plaintiffs, were foreseeable victims of the

Defendants' alleged harmful acts.  It would certainly be foreseeable that because Mr. Vera was

told that Delimar had died, he would not attempt to conduct an active search for her.  However,

as discussed above, the harm that Mr. Vera suffered in being separated from his daughter for six

years is too attenuated to the alleged acts of the Defendants.  In fact, the harm suffered by all of

the Plaintiffs is more directly related to the criminal actions taken by Ms. Correa.  There is no

crystal ball available to shed light on what might have happened had the Defendants discovered

the arson and conducted further forensic examinations.  Thus, while there was a relationship

between Mr. Vera and Delimar and the Defendants, the foreseeability of the harms alleged is too

attenuated to credit.

       The Court must finally consider whether the Defendants, as state actors, affirmatively

used their authority in a way that created a danger to Mr. Vera and/or Delimar and rendered them

more vulnerable to danger than had the Defendants not acted at all.  Here, Mr. Vera argues that

the Defendants' "complete lack of ability to discharge their duties in the way that they were

supposed to," along with the fact that the Defendants failed to properly examine the scientific

and forensic evidence appropriately and ignored important facts, amount to an affirmative action

that resulted in a six-year confinement for Delimar.  Jan. 25 Tr. at 25:12-24.  The Court does not

agree that the alleged negligent discharge of official obligations, fairly considered as amounting

to omissions rather than affirmative actions, constitutes an affirmative abuse of authority.

Moreover, the speculative thread that is interwoven throughout Plaintiffs' entire argument

continues throughout this element, as it is not at all clear to the Court that had the investigation

been conducted as the Plaintiffs would have wished, the period of Delimar's confinement would

have been less than it was.

       For all of the reasons discussed above, the allegations presented in Counts 3 and 4 of the

Vera Complaint are not sufficient to fall within the state created danger doctrine set forth in

DeShaney and its progeny.  Thus, any claim based on this theory will be dismissed.

b.      **Right to Companionship, Care, Custody, Control of Child**

The second component of Mr. Vera's substantive due process claims alleges that Mr.

Vera's Fourteenth Amendment right to liberty was violated because Mr. Vera was, as a result of

the Defendants' actions or omissions, denied his interest as a parent in the companionship, care,

custody and control of Delimar, and the right to make decisions concerning her rearing.[28]

It is well settled that the Due Process Clause of the Fourteenth Amendment provides

"heightened protection against government interference with certain fundamental rights and

liberty interests," and that the companionship, care, custody and control of a child is recognized

as a protected fundamental liberty interest.  See Troxel v. Granville, 530 U.S. 57, 65 (2000).[29]

However, courts within the Third Circuit and elsewhere have observed that such a right is not

unlimited, and that violations of due process rights are only recognized where the state took

action "specifically aimed" at interfering with the parent-child relationship.  See, e.g., McCurdy

v. Dodd, 352 F.3d 820, 829-30 (3d Cir. 2003) (stating that it would "stretch the concept of due

process too far if we were to recognize a constitutional violation based on official actions that

were not directed at the parent-child relationship."); see also Russ v. Watts, 414 F.3d 783, 788-89

---

[28]  The Court specially notes that the terms "companionship, care, custody and control"
are legal terms used to define a particular constitutional right.  In the context of the constitutional
rights of parents and children, the Court is reluctant to endorse language that could further
ingrain the notion that children are equivalent to the "property" of their parents and, therefore,
prefers to construe the terms to mean, in the words of Mr. Vera's very able and articulate
counsel, "the right of the parent to have an actual relationship with the child, to be able to love
that child and care for that child on a daily basis."  Jan. 25, 2006 at 35:22-24.

[29]  In Troxel, the Supreme Court considered whether the application of a state statute that
permitted any person to file a petition seeking visitation rights with a child, so long as the
visitation was found to be in the best interest of the child, resulted in an unconstitutional
infringement upon a parent's right to raise their child.  Troxel, 530 U.S. at 60.  The Court found
that the statute, as it was applied in that case, created such an infringement.  Id. at 72.

(7th Cir. 2005) (same); Ehly v. City of Philadelphia, No. 03-3634, 2004 WL 2644392 (E.D. Pa. Nov. 17, 2004) (stating that the Due Process Clause "has never been held to protect against government actions that affect the parental relationship only incidentally").

The most recent case decided by the Third Circuit to fully analyze the constitutional right in a parental relationship is McCurdy v. Dodd, 352 F.3d 820, 829-30 (3d Cir. 2003).[30]  In McCurdy, the plaintiff, Bobby McCurdy, was the father of Donta Dawson, a 19 year-old who had been killed by a police officer who mistakenly thought that Mr. Dawson had a weapon and was reaching for it during a routine stop.  McCurdy, 352 F.3d at 822.  Mr. McCurdy filed a lawsuit which included a Section 1983 claim grounded upon the violation of his liberty interest in the companionship of Mr. Dawson, and the district court granted summary judgment in favor of the defendants.[31]  Id. at 824.  The Court of Appeals for the Third Circuit affirmed the district court's holding, finding that an individual's liberty interest in the care, custody and control of children was grounded in the right to make critical child-rearing decisions and, therefore, did not extend to the relationship between a parent and an adult child.  Id. at 829.  In so holding, the McCurdy court also expressed reluctance to extend the Due Process Clause to encompass "official actions that were not deliberately directed at the parent-child relationship."  McCurdy, 352 F.3d at 829.

The Defendants here argue that Mr. Vera's claims must fail because, as in McCurdy, the

---

[30]  The Court notes that the Third Circuit Court of Appeals again addressed the issue in the non-precedential case of Hannah v. City of Dover, 152 Fed. Appx. 114, 116 (3d Cir. 2005). There, the court reiterated the McCurdy conclusion that the liberty interest in a parent-child relationship applies only to minor, and not adult, children.

[31]  The basis for the district court's grant of summary judgment did not address the constitutional issue, but rather held that Mr. McCurdy could not recover because he had accepted his statutory share of the state proceeds and had executed a settlement agreement with the decedent's mother.  McCurdy, 352 F.3d at 824-25.

actions taken were not directed at the parent-child relationship, but rather that any direct harm

suffered as a result of the fire was caused by Ms. Correa.  That is, the Defendants argue that any

harm caused by them was incidental to their primary duties and responsibilities.  Mr. Vera

disagrees, arguing that because the acts and omissions on the part of the state actors directly

resulted in his belief that his child was dead rather than missing, the actions were directly aimed

at the parent-child relationship.[32]

In this case, there is no question that Mr. Vera has a constitutional liberty interest in the

companionship, care, custody and control of Delimar, who was and remains today a minor child.

However, the allegations in Mr. Vera's Complaint do not really allege a direct a link to harm, as

the law requires.  That is, although the alleged acts and omissions did lead Mr. Vera to believe

that Delimar had died in the house fire, those actions are only alleged to have been erroneous, not

intentional.  In fact, at oral argument, counsel for Mr. Vera understandably referred to the

representations of Delimar's death as "clearly erroneous."  <u>Jan. 25 Tr.</u> at 24:12.  Moreover, the

attenuation that plagues the other claims in this case persists on this issue as well.  To accept Mr.

Vera's argument that the actions of the Defendants was "directly aimed" at separating Delimar

from him, the Court must make the speculative leap, that had Mr. Vera known that Delimar was

not dead, he would have been successful in his certain search to locate her.  Unless Mr. Vera had

had some reason to suspect nefarious conduct by Ms. Correa (or some specific person like her),

in which case he would surely have given that information to the authorities no matter what they

erroneously believed or told him, there is simply no logical reason to think a frantic or dogged

---

[32]  Aside from citing to cases establishing the well-settled right, e.g., <u>Troxel</u>, Mr. Vera
does not cite to any cases in which a court has found that police or other activities similar to
those taken in this case were directly aimed at the parent-child relationship.

41

parental search would have been successful.  Stated more plainly, the facts, as alleged, are not sufficient to support such speculation and, for these reasons, Mr. Vera's substantive due process claim based on this theory will be dismissed.

### D.     Personal Involvement of Certain Individual Defendants

Defendants next argue that the claims against former Fire Commissioner Harold Hairston, former Police Commissioner Richard Neal and Medical Examiner Haresh Mirchandani, M.D. must be dismissed because the Complaint does not attribute any specific behavior to these defendants.  In response, Ms. Cuevas argues that under the requirements of "notice pleading," no such detail is required at this stage of the litigation.  Moreover, Ms. Cuevas argues, each of these defendants is identified in the Complaint as a person "who was responsible for training and instructing . . . personnel, and establishing, implementing, and supervising official policy. . . ." Cuevas Compl. at ¶¶ 5, 11, 17; Vera Compl. at ¶¶ 5, 11, 17.  Because the Court has concluded that the allegations in neither of the complaints meet the requirements of Federal Rule of Civil Procedure 12(b)(6), this argument will not be addressed.

### E.     Qualified Immunity

The Defendants finally argue that the doctrine of qualified immunity requires that the claims against all of the Individual Defendants be dismissed.  In general, government officials performing discretionary functions are shielded from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982). Where a defendant seeks the benefit of qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is

dispositive.  Saucier v. Katz, 533 U.S. 194, 200 (2001).

Courts apply a two-part test to determine whether qualified immunity applies in a particular case. First, a court must consider whether the facts, considered in a light most favorable to the allegedly injured party, show that the official's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Once it is shown that a constitutional right was violated, a court must then consider whether the right was clearly established, such that the official had reason to know the consequences of his or her specific actions. See Saucier, 533 U.S. at 201; Anderson v. Creighton, 483 U.S. 635, 636-37 (1987); see also Berg v. County of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000).  In this case, because the Court has concluded that the allegations do not support a claim for a violation of a constitutional right, the Court need not continue its analysis with respect to qualified immunity.

### F.    State Law Claims

Mr. Vera's Complaint also includes two claims that are based upon state law.  Counts 5 and 6 of the Vera Complaint allege claims of intentional infliction of emotional distress against the Individual Defendants (Count 5) and the City (Count 6).  The only basis for the exercise of jurisdiction over these claims is that of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  See Vera Compl. at ¶ 1.  Section 1367 states that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . ."  28 U.S.C. § 1367.

There are, however, exceptions to the exercise of supplemental jurisdiction.  For example, Section 1367(c)(3) allows a district court to decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction. In this case, because all of the federal claims will be dismissed, the Court exercises its discretion to decline the exercise of supplemental jurisdiction over the state law claims.

CONCLUSION

For the reasons discussed above, the Defendants' Motions to Dismiss the Complaints filed by Ms. Cuevas and Mr. Vera will be granted.  An appropriate Order follows.


S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge


August 11, 2006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LUZ AIDA CUEVAS, INVIDUALLY | : | CIVIL ACTION |
| ON HER OWN BEHALF AND AS | : | |
| PARENT AND NATURAL GUARDIAN | : | |
| OF, AND ON BEHALF OF DELIMAR | : | |
| VERA, A MINOR, ET AL., | : | |
|             Plaintiffs, | : | |
| | : | |
|       vs. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL., | : | |
|             Defendants. | : | No. 05-3749 [Consolidated] |

## O R D E R

**AND NOW**, this 11th day of August, 2006, upon consideration of the Motion to Dismiss the Cuevas Complaint filed by Joseph E. Rissling, Haresh Mirchandani, Carl Spurill, David Quain, Greg McDonald, Carolyn H. Revercomb, Richard Neal, City of Philadelphia, Harold B. Hairston, John J. Grugan, Vincent W. Heeney, Robert J. McBrearty, and Lucien Cerulli (Cuevas Docket No. 8), the Motion to Dismiss the Cuevas Complaint filed by Pat Kauffman (Cuevas Docket No. 11), the Motion to Dismiss the Vera Complaint[1] filed by Robert J. McBrearty, Lucien Cerulli, Joseph E. Rissling, Haresh Mirchandani, Carl Spurill, David Quain, Greg McDonald, Carolyn H. Revercomb, Richard Neal, City of Philadelphia, Harold B. Hairston, John J. Grugan and Vincent W. Heeney (Vera Docket No. 7), the responses thereto (Cuevas Docket Nos. 17, 19, 20, 21, 32  and Vera Docket Nos. 12, 13), it is **ORDERED** that all of the Motion are

---

[1]  The Court notes that Vera v. City of Philadelphia, et al., Case No. 05-5037, was closed and this motion was terminated when the case was consolidated with Cuevas v. Philadelphia, et al., Case No. 05-3749.  However, because the Vera complaint presented additional claims, the motions to dismiss the respective complaints are treated separately.

**GRANTED**.  The Clerk of Court is instructed to mark this consolidated case as closed.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge